[No. D021622. Fourth Dist., Div. One. May 21, 1996.]

JEFF MYZER et al., Plaintiffs and Appellants, v.
EMARK CORPORATION et al., Defendants and Respondents.

**COUNSEL**

Robert J. Danko for Plaintiffs and Appellants.

Peter H. Lawrence, Pyle, Sims, Duncan & Stevensen and Gerald N. Sims for Defendants and Respondents.

**OPINION**

**HUFFMAN, J.**—Jeff Myzer brought this class action on behalf of employees of Emark Corporation (Emark) who had been denied wages and benefits

due. The court denied his motion to determine priority of claims and granted the cross-motions of defendants Pat Keig, Mike Rummel and Rieck and Crotty, P.C. (Rieck & Crotty), Emark's secured creditors. Myzer appeals the denial of his motion and the ensuing judgment, contending the employees' claims are entitled to priority under Code of Civil Procedure[1] section 1205. We agree.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Rieck & Crotty's Claim*

Rieck & Crotty were Emark's corporate counsel until around March 1993. On April 29, 1992, Emark executed a $170,000 promissory note and an agreement granting Rieck & Crotty a perfected security interest in accounts, general intangibles, inventory, equipment, cash and records. On July 1, 1993, after Emark defaulted, Rieck & Crotty agreed not to seek immediate enforcement in exchange for a $229,260.62 note secured by the same collateral.

After Emark again defaulted, Rieck & Crotty foreclosed and acquired the collateral through a $170,000 credit bid at the November 11, 1993, foreclosure sale, subject to prior secured claims of the Bank of Southern California (BSC) and Alliance Financial of California, Inc. (Alliance). On November 22, 1993, Rieck & Crotty sold the collateral to Sorrento Electronics, Inc. (Sorrento) for $350,000, out of which the debts to BSC and Alliance were to be satisfied, plus a contingent amount not to exceed $2 million, to be paid in quarterly increments through 1998, based on a percentage of net invoice prices of products and services Sorrento sold, subject to certain offsets.

### *Keig and Rummel's Claim*

Keig was a director of Emark and Rummel was its chief financial officer. On January 1 and 2, 1992, Emark executed a $74,549.73 note in favor of Rummel, notes totaling $591,668.41 in favor of Keig, and agreements granting them perfected security interests in certain property. On April 29, 1992, Emark executed a $50,000 note in favor of Keig. On July 1, 1993, after Emark defaulted, Keig and Rummel agreed not to seek immediate enforcement and Emark executed a $129,210 secured note in favor of Rummel and a $772,993.14 secured note in favor of Keig. On September 2, 1993, Keig and Rummel recorded a "UCC-1" financing statement. Emark again defaulted.

---

[1]All statutory references are to the Code of Civil Procedure unless otherwise specified.

*The Employees' Lawsuit*

In late 1993, the paychecks of all Emark employees were held and the employees were told they would be paid as part of the closing costs of the sale to Sorrento. After the sale was finalized, Emark's creditors told the employees they would be offered a percentage of their wages and benefits because there was not enough money for everyone. Apparently, no employees were paid after August 30, 1993.

On October 25, 1993, Myzer filed the complaint to recover wages and benefits and for damages, an accounting, and declaratory and injunctive relief. The amended complaint, filed November 16, 1993, requests additional relief including appointment of a receiver. In the instant action, approximately 45 Emark employees seek recovery of unpaid wages and benefits earned between August 30 and October 21, 1993.

On November 19, 1993, the parties submitted to the court the issue of priority of the claims of Emark's employees and secured creditors. On April 28, 1994, the court denied Myzer's priority motion and granted the motions of Keig, Rummel and Rieck & Crotty.

### DISCUSSION

■ Myzer contends section 1205 gives Emark's employees' claims priority over the claims of Emark's secured creditors Keig, Rummel and Rieck & Crotty.

Section 1205 states: "Upon the sale or transfer of any business or the stock in trade, in bulk, or a substantial part thereof, not in the ordinary and regular course of business or trade, unpaid wages of employees of the seller or transferor earned within ninety (90) days prior to the sale, transfer, or opening of an escrow for the sale thereof, shall constitute preferred claims and liens thereon as between creditors of the seller or transferor and must be paid first from the proceeds of the sale or transfer."

There appears to be no case law interpreting section 1205.[2] In its ruling on the priority motions, the trial court cited *T.H. Mastin & Co.* v. *Pickering Lumber Co.* (N.D.Cal. 1933) 2 F.Supp. 605. That case construed section 1204, which then provided:

---

[2]Myzer argues the legislative intent underlying section 1205 supports his interpretation of this statute. His proffered legislative materials, however, comprise the subjective intent of the legislator who introduced the bill and the director of the state department which requested its introduction, matters we do not consider. (*Roberts* v. *City of Palmdale* (1993) 5 Cal.4th 363, 377-378 [20 Cal.Rptr.2d 330, 853 P.2d 496].)

" 'When any assignment, whether voluntary or involuntary, and whether formal or informal, is made for the benefit of creditors of the assignor, or results from any proceeding in insolvency or receivership commenced against him, . . . the wages and salaries of miners, mechanics, salesmen, servants, clerks, laborers, and other persons, for personal services rendered such assignor, . . . within ninety days prior to . . . the commencement of the proceeding when a court action is involved, and not exceeding two hundred dollars each, constitute preferred claims, and must be paid by the trustee, assignee or receiver before the claim of any other creditor of the assignor, insolvent, or debtor whose property is so turned over, and must be paid as soon as the money with which to pay same becomes available. . . .

" 'This section is binding upon all the courts of this state and in all receivership actions, except those based on a prior recorded lien, the court must order the receiver to pay promptly out of the first receipts and earnings of the receivership, after paying the current operating expenses, such preferred labor claims.' " (*T.H. Mastin & Co.* v. *Pickering Lumber Co.*, *supra*, 2 F.Supp. at p. 607.)

The *Mastin* court concluded: "The sentences of section 1204 are apparently contradictory. The first sentence makes wage claims preferred claims 'before the claim of any other creditor,' which would seem to make them prior to secured liens. The last sentence of the section applies to operating receiverships, provides that these preferred claims shall be paid first after the current operating expenses out of the first receipts and earnings, but excludes from its effect receiverships based on a prior recorded lien. As to the first sentence, the Legislature had the power to make these claims prior to mortgage claims by expressly stating so in the statute but not otherwise. 14a Corpus Juris, 1025; Fitzgerald v. Meyer [(1896)] 65 Mo.App. 665; Schmidtman v. Atlantic Phosphate & Oil Corporation [2d Cir. 1916] 230 F[ed]. 769. The statute of New York state (Laws 1897, c. 415, § 8), construed in the Schmidtman Case, supra, provided that 'upon the appointment of a receiver of a partnership or of a corporation . . . the wages of the employees of such partnership or corporation shall be preferred to every other debt or claim.' After a careful consideration of the authorities interpreting statutes giving priorities, the court held that such a statute cannot impair contract liens unless its language clearly indicates an intention to do so, that the statute in question did not contain such express language, and that the effect of the statute was to give priority in the unincumbered assets but not in the incumbered assets. Similarly there is nothing in the California statute expressly giving preference over mortgage liens. Our statute creates a preference in behalf of wage claims, but the preference is over general creditors and not over secured creditors. The first sentence of section 1204 is therefore

entirely consistent with the exclusion of receiverships based on recorded liens in the last sentence. Light is thrown upon the meaning of the last sentence of section 1204 by the interpretation of a similar statute in Oregon (B. & C. Comp. § 1083), which, however, lacked the exception in behalf of prior recorded liens. It provided for the payment of wage claimants out of 'the first receipts and earnings of said . . . corporation, after paying current operating expenses.' The Supreme Court of Oregon, in the case of Security Trust Co. v. Goble R. Co., 44 Or. 370, 74 P. 919, 75 P. 697, held that such a provision applied only to the surplus earnings of the receivership and gave no priority in the corpus of the estate. See, also, 14a Corpus Juris, 1025, and 1 Clark on Receivers (2d Edition) p. 967. With the exception of receiverships based on a prior recorded lien expressly incorporated in the statute, these claimants have no priority even in the surplus earnings, if any there be. This makes it unnecessary to consider the mass of accounting detail presented to determine whether or not there are surplus earnings of the receivership. The effect of section 1204 in receivership proceedings 'based on a prior recorded lien' is to give wage and compensation claimants priority over general creditors and over all creditors in the unincumbered assets of the corporation." (*T.H. Mastin & Co.* v. *Pickering Lumber Co., supra,* 2 F.Supp. at pp. 607-608.)

*Mastin* is distinguishable from the instant situation because the statute here accords wage claimants a lien, not merely a preferred claim, and moreover sets forth no exclusions or limitations. Similarly, *First Nat. Bank* v. *Family Medicine Clinic* (1990) 14 Kan.App.2d 749, 750-751 [798 P.2d 519, 520-521], and *Seymour* v. *Berg* (1907) 227 Ill. 411, 420 [81 N.E. 339, 342], on which the trial court here also relied, concerned preference statutes, not lien statutes. In cases construing lien statutes, however, wage earners may prevail. (*Warren* v. *Sohn* (1887) 112 Ind. 213 [13 N.E. 863, 867-869] [mine workers' statutory lien for labor performed had priority over mortgage liens]; *Graham* v. *Magann Fawke Co.* (1904) 118 Ky. 192 [80 S.W. 799, 800] [manufacturer's employee's statutory wage lien was superior to mortgage]; *Sitton* v. *Dubois* (1896) 14 Wash. 624 [45 P. 303, 304] [laborer's lien was superior to chattel mortgage].)

The trial court here further determined section 1205 was inapplicable because it relates only to bulk sales. We disagree with the court's premise. A bulk sale involves the sale "of more than half the seller's inventory and equipment . . . ." (Cal. U. Com. Code, § 6102, subd. (a)(3)(ii).) Section 1205, on the other hand, refers to "the sale or transfer of any business or the stock in trade, in bulk, or a substantial part thereof . . . ." Section 1205

therefore encompasses, in addition to bulk transfers, transfers of "a substantial part" of a business or its stock in trade.[3] The foreclosure proceedings and subsequent sale to Sorrento, characterized by Emark's past acting president as a sale of Emark itself, amount to a transfer of a substantial part of Emark's business or stock in trade. California Uniform Commercial Code section 9101 et seq. (Secured Transactions) on which Keig, Rummel and Rieck & Crotty rely, does not apply. (Cal. U. Com. Code, § 9104, subd. (c).)

Finally, Rieck & Crotty contend by failing to file a specific denial to their December 20, 1993, verified[4] cross-complaint, Myzer admitted their perfected security interest was senior to his claim. On November 19, 1993, however, all parties stipulated to submit the priority issue to the court.

We conclude section 1205 accorded Emark's employees' claims priority over those of Emark's secured creditors Keig, Rummel and Rieck & Crotty.

## DISPOSITION

The judgment is reversed. The trial court is directed to determine the amount of appellants' claims and thereafter enter judgment for appellants, who shall recover costs on appeal.

Benke, Acting P. J., and Nares, J., concurred.

Petitions for a rehearing were denied June 13, 1996, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied September 4, 1996.

---

[3]At the time section 1205 was enacted, a bulk sale was defined as "any transfer in bulk and not in the ordinary course of the transferor's business of a substantial part of the materials, supplies, merchandise, or other inventory . . . ." (Former Cal. U. Com. Code, § 6102, subd. (1).) We must presume the Legislature, in changing the definition of a bulk sale to that in California Uniform Commercial Code section 6102, subdivision (a)(3), was aware of the "substantial part" language in section 1205 and chose not to disturb it. (*Viking Pools, Inc.* v. *Maloney* (1989) 48 Cal.3d 602, 609 [257 Cal.Rptr. 320, 770 P.2d 732].)

[4]Rieck & Crotty are incorrect in characterizing their cross-complaint as verified. The purported verification was made "under penalty of perjury under the laws of the State of Illinois," not under California law as required by section 2015.5.